UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SEDGWICK INSURANCE AND
ANGELA SARAZIN,                                    Case No. 13-10485

             Plaintiffs,                          Paul D. Borman
                                                   United States District Judge
v.

                                           David R. Grand
F.A.B.E. CUSTOM DOWNSTREAM                          United States Magistrate Judge
SYSTEMS, INC.

             Defendant.
_____/

## OPINION AND ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF NO. 45)

Now before the Court is Defendant F.A.B.E. Custom Downstream Systems, Inc.'s ("CDS") June 16, 2014, Motion for Summary Judgment of All Claims Pursuant to Fed. R. Civ. Proc. 56(a). (ECF No. 45). Pursuant to a stipulation to extend the time to file a response, Plaintiff Angela Sarazin filed her response on July 17, 2014 and then a corrected response on July 18, 2014. (ECF Nos. 47, 48). Defendant CDS then filed a reply. (ECF No. 53).

This case was consolidated pursuant to a stipulation on August 16, 2013 (ECF No. 21), such that *Sedgwick Insurance v. CDS, Inc.*, case number 13-10485 was consolidated with *Angela Sarazin v. Custom Downstream Systems, Inc.*, case number 13-10492. Thereafter, the caption in this action was amended to reflect the correct corporate name of the defendant, F.A.B.E. Custom Downstream Systems, Inc., that was misidentified in the pleadings as "Custom Downstream Systems, Inc." (ECF Nos. 26, 58).

A hearing was held on this matter on September 26, 2014. For the reasons set forth

below, the Court shall DENY Defendant's Motion for Summary Judgment.

# I. BACKGROUND

On February 24, 2010, Plaintiff Angela Sarazin cut off most of her hand on a Servo-Fly Knife Cutter ("SFK Cutter") while working for Fagerdala USA-Marysville, Inc. ("Fagerdala") as seasonal general labor on loan from a temporary employment agency called Manpower. (Def.'s Ex. I, Sarazin Dep. at 13, 33, Compl. ¶ 7; Ex. P, Cornenworth Dep. at 17, 70).[1]

A.     Process to make Foam Noodles

Fagerdala was in the business of producing a variety of foam products including "pool noodles", which are floatation devices made of foam and usually long and tubular in shape.[2] (Compl. ¶ 7; Cronenworth Dep. at 8-9). Fagerdala used multiple pieces of machinery to produce its foam products including pool noodles. (Cronenworth Dep. at 24-27). The first machine on the line was an extruder which melted the polyethylene resin and introduced a isobutan gas into the melted resin. In the creation of pool noodles, the melted resin then exited the extruder in one continuous strand of anywhere from 50 to 70 feet in length. (Cronenworth Dep. at 8, 24-27). The shape of the foam or its "profile" was dictated by a die or sheath through which the foam was extruded. (Ex. Q, Jorgensen Dep. at 10-11). The strand then went into a water bath, which involved spraying water onto the extruded resin to cool it. (Cronenworth Dep. at 26-27). After the water bath, the foam strand was fed into a "puller" which was described as

---

[1] For ease of reference, all citations to the record will be to Defendant CDS's exhibits unless otherwise noted.

[2] Fagerdala USA-Marysville, Inc. shut down its plant on or about October 1, 2011 and a company called Michigan Foam and Fabrication took over the plant. (*See* Ex. Q, Jorgensen Dep. at 6-7, 13)

"tank tracks" that would propel the foam strand into the SFK Cutter.  (*Id*.).  The SFK Cutter then

cut the foam strand to the appropriate length, 60 inches.  (*Id*.).  The 60 inch long pool noodle was

then carried on a conveyor belt to the labeler, where a label would be blown on to it, and it was

then dropped onto a table where it was boxed by an employee.  (*Id*. at 27-28).

The SFK Cutter had a single blade that would automatically cycle to cut the foam strand.

(*Id*. at 28, 41).  The SFK Cutter's blade cycled in response to an electronic signal received from

the puller which was based on the revolutions or speed of the puller.  (*Id*. at 51-52; Ex. B, Pecora

Dep. at 149).  Therefore, the SFK Cutter cut at regular intervals regardless of whether product

was being extruded, and based only on the continued operation of the puller.  (Cronenworth Dep.

at 52; Pecora Dep. at 149).

B.      Plaintiff Sarazin's Injury

At the time of her injury, Plaintiff Sarazin had been working for approximately three

weeks on Fagerdala's assembly line and she was positioned at the end of the conveyor belt

approximately fifteen feet downstream from the SFK Cutter.  (Sarazin Dep. at 39, 42;

Cronenworth Dep. at 17; Jorgensen Dep. at 30).  Plaintiff Sarazin described her job and location

as being: "where the pool noodles come off the conveyor belt, land on the table, I check them,

make sure they're the right color, it's got a sticker, and put them in the box accordingly".

(Sarazin Dep. at 39:21-24; Ex. N, Zimmer Dep. at 11).  After Plaintiff Sarazin had filled all of

the boxes on her cart with noodles, she would then go retrieve another cart full of empty boxes to

fill with noodles.  (*Id*. at 42).  Plaintiff Sarazin never actually worked on the SFK Cutter and it

was not part of her job to run or operate that machine.  (Cronenworth Dep. at 17; Jorgensen Dep.

at 52, 67).  Plaintiff Sarazin testified that she did not receive any safety training on any of the

machines but was told by supervisors not to put her hands into any of the machines. (Sarazin Dep. at 36, 71).

On or about the morning of February 24, 2010, employees were notified that the line was shutting down and to clean up before going home. (Sarazin Dep. at 64; Jorgensen Dep. at 65). Plaintiff Sarazin testified that she believed there may have been a problem or jam up with the machines, although other employees testified that there was a "changeover" to a different color noodle that necessitated shutting down the line. (*Id.*; Pl.'s Ex. 19, Lawson Dep. at 26; Ex. Q, Jorgensen Dep. at 46). Plaintiff Sarazin testified it was the first time the plant had shut the machines down while she had been working on the line. (Sarazin Dep. at 64). It is undisputed that Plaintiff Sarazin was never trained on the operation of the SFK Cutter or on safety procedures related to the SFK Cutter.

At the time of the machine jam or changeover, Plaintiff Sarazin was instructed by a supervisor to clean up all the noodles from the table and under and around the machine. (*Id.* at 65). While cleaning she saw two white noodles stuck in the input or feed side of the SFK Cutter. (*Id.* at 68-69). Plaintiff Sarazin testified that she believed that the machines were off so she did not get a supervisor to remove the noodles from the input feed of the SFK Cutter, but stuck her own hand in to grab them. (*Id.* at 69, 85). Plaintiff Sarazin also did not know prior to the accident that there was a blade in the SFK Cutter. (*Id.* at 49). Upon inserting her hand into the feed side of the SFK Cutter, she felt a tingle and then does not remember anything due to shock. (*Id.* at 72).

Meanwhile a Fagerdala supervisor, Barry Jorgensen, testified that in order to changeover the line he first shut down the feed to the extruder and then proceeded to walk down to the puller

4

and SFK Cutter to power them down.  However, before he reached the puller or the SFK Cutter

to power them down, he encountered Plaintiff Sarazin coming towards him with an obvious

injury to her hand.  (Jorgensen Dep. at 50, 55).

The SFK Cutter cut off 3/4's of Plaintiff Sarazin's right hand.  Doctors attempted to

reattach Plaintiff Sarazin's hand, however, the re-attachment failed.  (*Id*. at 98-99,103).  Thirteen

months after the failed re-attachment, Plaintiff Sarazin had her hand and arm amputated up to her

mid forearm.  (*Id*.).

C.      The SFK Cutter

It is undisputed that the SFK Cutter at issue in this litigation, model CSFK 6.5, was

designed, manufactured, and sold by Defendant CDS.  (*See* Pl.'s Ex. 4, Interrogatories; Compl.

at ¶ 3; Ex. B at 21, 1/27/06 Invoice for Belt Haul-Off and Servo Fly Knife Cutter Model No.

CSFK-6.5).  Anthony Pecora, then a sales representative for Defendant CDS, testified that

negotiations between Fagerdala and Defendant CDS regarding the purchase of the SFK Cutter

began in approximately 2004 and culminated in the purchase of the SFK Cutter and the puller in

January 2006.  (Ex. B, Pecora Dep. at 49-50).  Pecora explained that he visited the Fagerdala

plant at least once during the negotiations regarding the purchase of equipment, sometime

between December 2004 and January 2006.  (*Id*. at 44).  Pecora explained that at the time

Defendant CDS shipped the SFK Cutter it came with a blade guard with disconnect and bushings

over the input and outlet to the cutter blade.[3]   (*Id*. at 58-60, 62-63; *see* Ex. T at 1 (picture)).

However, Defendant CDS does not dispute that the SFK Cutter was "not usable" as a cutter in

---

[3] Pecora described the "safety guard" as a rectangular guard that is over the blade such that the blade is completely enclosed.  If the guard is opened, then the machine will shut off. (Pecora Dep. at 58-59).

this condition unless the customer modified the SFK Cutter by either removing or drilling

through the bushings to allow product to go through the machine to be cut.  (Pecora Dep. at 63-

64, 93-94; Pl.'s Br. Ex. 7, Gerry Lamorte Dep. at 30, 38).  Defendant CDS's field technician

manager, Gerry Lamorte, explained that once the SFK Cutter's bushings were opened, the

machine would need safety guarding to ensure safety.  (Lamorte Dep. at 38, 40).  At the time

Fagerdala purchased the SFK Cutter, Defendant CDS offered a 36 inch tunnel guard with

interlock (such that removing the guard would turn off the machine) as a separate option for

purchase.  (Pecora Dep. at 71-73; Lamorte Dep. at 33).  Defendant CDS contends that it was its

normal business practice to offer this safety feature to customers, however, there is no

documentary evidence or testimony that this safety feature was ever offered to Fagerdala.

(Pecora Dep. at 74).  Plaintiff Sarazin argues that Fagerdala was unaware that these guards were

available for purchase.  (*See* Ex. B, Price quotations from 2004 through 2006, 2006 Invoice; Pl.'s

Ex. 9, Gerald Seltz Dep. at 22-24).

It is undisputed that at the time of Plaintiff Sarazin's injury, there was a twelve inch

tunnel guard on the SFK Cutter.  (Ex. O, MIOSHA Violation and Penalty Document, at 5).  This

12 inch guard was fabricated by Fagerdala, specifically Dwain Seltz who was employed by

Fagerdala as a maintenance technician.  (Ex. M, Seltz Dep. at 10, 25).  Mr. Seltz was directed by

Victor Moenaert, Fagerdala's maintenance manager, to fabricate the tunnel guard and weld it on

to the SFK Cutter.  (*Id*. at 25-27).  Mr. Seltz testified that he could not remember the length of

the tunnel he fabricated for the SFK Cutter but he did not believe that the tunnel guard was ever

shortened after he created it.  (*Id*. at 27).  Mr. Seltz then later testified that he believed the tunnel

guard he first created was longer than 12 inches. (*Id*. at 46-47).  Mr. Seltz also fabricated an

extension to the tunnel guard after Plaintiff Sarazin's injury which extended the tunnel guard to at least 32 or 36 inches.  (*Id*. at 27-28).

Victor Moenaert testified that he and Dwain Seltz determined what length to make the tunnel guard but explained that he did not remember why, stating:

> I know at the time when we looked at [the SFK Cutter] we knew that it had to be, it had to be guarded so we had to put this on and I can't remember when it came from CDS if it, if it had just a short [guard] on it or if it had, you know, something that said because it's custom design system that you have to guard it.  I don't remember why the decision was made but we made the decision to put this on.

(Ex. L, Moenaert Dep. at 17:19-18:1).  Moenaert was also unaware of any OSHA guidelines that dictated guarding be certain length based on a formula.  (*Id*. at 18).  Moenaert explained that he believed that the tunnel guard that was originally fabricated by Fagerdala was longer than 12 inches and could have been as long as 36 inches but that it may have been shortened by an unknown person at an unknown time.  (*Id*. at 20, 22).

D.     Expert Testimony and ANSI Standards

Both of Plaintiff Sarazin's experts, John Lauhoff and Harold Josephs, as well as Defendant's expert David Eby, agree that the MIOSHA statutes incorporate by reference the American National Standard for Machine Tools ("ANSI") safety standards.  (Ex. C, Lauhoff Dep. at 71; Ex. D Josephs Dep. at 37, 79; Ex. E, Eby Dep. at 121-22).  Further, both Plaintiff Sarazin's experts agree that under the ANSI definitions, both Defendant CDS and Fagerdala were considered "safeguarding suppliers".  (Lauhoff Dep. at 133, 135; Josephs Dep. at 107, 111).  Plaintiff's expert, Lauhoff, testified that Defendant CDS violated ANSI standards by failing to provide a safe piece of equipment with proper guarding (specifically a 32 to 36 inch tunnel guard).  (Lauhoff Dep. at 65-67, Josephs 49, 78-79).

7

Defendant's expert, Eby, testified that under MIOSHA and ANSI standards the onus was on Fagerdala to safeguard the SFK Cutter. (Eby Dep. at 92). Eby testified that under ANSI, Fagerdala was the user and the supplier because it added the tunnel guard, while Defendant CDS was the supplier. (*Id*. at 115-16). Further, Eby testified that "the only way that [the SFK Cutter] could be safeguarded in the assembly line is to safeguard it in the assembly line. There is no other way." (Eby Dep. at 82:8-11). He then went on to clarify that the SFK Cutter might not be functional with 36-inch tunnel guards as a standard feature "depending how it is put, again, back into the assembly line" and that such a feature would force a user to potentially modify the machine. (*Id*. at 83). Defendant's expert also testified that under MIOSHA and ANSI there were other ways to safeguard the machine, namely through location or barrier guard, such that CDS was not required to sell 36 inch tunnel guards for safety. (*Id*. at 86). Defendant's expert further testified that Defendant CDS would not have known how the SFK Cutter was assembled in Fagerdala's assembly line because they did not install the machine. (*Id*. at 202). Defendant's expert also testified that interlocking 36 inch tunnel guards were an available, alternative, and reasonable design. (*Id*. at 207). Interestingly, Defendant's expert testified that while CDS did not know anything about the assembly line, Defendant CDS did have enough information to safeguard the puller it sold to Fagerdala by position. (*Id*. at 224).

E.     ANSI Standards

Under the ANSI standards a "supplier" is defined as "An individual, corporation, partnership or other legal entity or form of business who provides equipment or services." (Ex. J, ANSI standards, at 3.70). A user is defined as "[a]n entity that utilizes machines, systems, and related equipment." (*Id*. at 3.74). This defintion is explained in more detail as "when the user

8

manufactures, installs, modifies, rebuilds or integrates the safeguarding; the user is considered

the supplier." (*Id*. at E.3.74). In defining responsibilities, "the safeguarding supplier within the

scope of its work activity, shall ensure that safeguarding meets the design, construction,

integration and installation requirements of this standard." (*Id*. at 4.1.1). However, "[w]hen the

user designs, constructs, installs, modifies, or reconstructs the safeguarding, the user is

considered to be the supplier." (*Id*. at E4.2.1). "Changes in the production system that may

affect the safeguarding include, but are not limited to: ... modification of the machine...." (*Id*. at

E.4.2.3).

## II. STANDARD OF REVIEW

Defendants and Plaintiff have moved for summary judgment under Rule 56(a) of the

Federal Rules of Civil Procedure. This rule provides that summary judgment "should be

rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show

that there is no genuine issue as to any material fact and that the movant is entitled to judgment

as a matter of law." Summary judgment is appropriate where the moving party demonstrates

that there is no genuine issue of material fact as to the existence of an essential element of the

nonmoving party's case on which the nonmoving party would bear the burden of proof at trial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "Of course, [the moving party] always bears

the initial responsibility of informing the district court of the basis for its motion, and identifying

those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any,' which it believes demonstrate the absence of genuine issue

of material fact." *Id*. at 323; *see also Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987).

A fact is "material" for purposes of a motion for summary judgment where proof of that

fact "would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties."   *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (quoting BLACK'S LAW DICTIONARY 881 (6th ed. 1979)) (citations omitted).  A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  Conversely, where a reasonable jury could not find for the nonmoving party, there is no genuine issue of material fact for trial. *Feliciano v. City of Cleveland*, 988 F.2d 649, 654 (6th Cir. 1993).  In making this evaluation, the court must examine the evidence and draw all reasonable inferences in favor of the non-moving party. *Bender v. Southland Corp.*, 749 F.2d 1205, 1210-11 (6th Cir. 1984).

If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial" will mandate the entry of summary judgment.  *Celotex*, 477 U.S. at 322-23.  The non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial. FED. R. CIV. P. 56(e).  The rule requires that non-moving party to introduce "evidence of evidentiary quality" demonstrating the existence of a material fact. *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997); *see Anderson*, 477 U.S. at 252 (holding that the non-moving party must produce more than a scintilla of evidence to survive summary judgment).

Defendant CDS also moves to dismiss Plaintiff Sedgwick Insurance's ("Sedgwick") complaint for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6).  Fed. R. Civ. P.

12(b)(6) allows for the dismissal of a case where the complaint fails to state a claim upon which relief can be granted.  When reviewing a motion to dismiss under Rule 12(b)(6), a court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *DirectTV, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007).  But the court "need not accept as true legal conclusions or unwarranted factual inferences." *Id.* (quoting *Gregory v. Shelby County*, 220 F.3d 433, 446 (6th Cir. 2000)).  "[L]egal conclusions masquerading as factual allegations will not suffice." *Eidson v. State of Term. Dep't of Children's Servs.*, 510 F.3d 631, 634 (6th Cir. 2007).

The Court notes that Defendant CDS relies extensively upon evidence that is outside the pleadings in its arguments.  To the extent this Court relies upon this evidence which is outside the pleadings, this motion must be treated as one for summary judgment under Fed. R. Civ. P. 56(a).  *See* Fed. R. Civ. P. 12(d).

### III. ANALYSIS

Plaintiff Sarazin's complaint alleges five counts: (1) Negligence, (2) Implied and Expressed Warranty of Fitness and Merchantability; (3) Products Liability Act, Mich. Comp. Laws § 600.2945, *et seq*.; (4) Knowledge of Defective Product, Mich. Comp. Law § 600.2949a; and (5) Gross Negligence.  Plaintiff Sarazin contends that Defendant CDS's product, the SFK Cutter, was defectively designed.  Defendant CDS does not address Plaintiff Sarazin's claims individually but contends broadly in its motion for summary judgment that: (1) Defendant CDS cannot be liable when Fagerdala modified the SFK Cutter after its purchase; (2) Defendant CDS did not owe a duty to Plaintiff Sarazin and that its alleged acts and actions do not constitute proximate cause of Plaintiff Sarazin's injury, and therefore, the (negligence, warranty claim,

11

products liability claim, and knowledge of a defective product) claims should be dismissed.[4]

Defendant CDS also contends that Plaintiff Sarazin cannot prove gross negligence or knowledge of a defective condition.  Finally, Defendant CDS argues that Plaintiff Sedgwick's claim must also be dismissed where Defendant CDS is not liable for Plaintiff Sarazin's injury.

## A.    *Prima Facie* **case for Design Defect**

To establish a *prima facie* case of product liability under Michigan law, a plaintiff must show that "the defendant supplied a product that was defective and that the defect caused the injury." *Auto Club Ins. Ass'n. v. Gen. Motors Corp.*, 217 Mich. App. 594, 604 (1996).  "A defect in the product can be established through a variety of theories, including: (1) negligent design of the product; (2) negligent manufacture of the product; (3) negligent failure to warn about some aspect of the product; (4) breach of an express or implied warranty; or (5) misrepresentation or fraud."  *Eiben v. Gorilla Ladder Co.*, No. 11-10298, 2013 WL 17121677, at *8 (E.D. Mich. Apr. 22, 2013) (citation omitted).  In the present action, Plaintiff Sarazin appears to proceed under a theory of negligent design.

"A manufacturer has a duty to design its product to eliminate 'any unreasonable risk of foreseeable injury.'"  *Prentis v. Yale Mfg. Co.*, 421 Mich. 670, 692-93 (1984) (citation omitted).  "A product is defective if it is not reasonably safe for its foreseeable uses."  *Ghrist v. Chrysler Corp.*, 451 Mich. 242, 249 (1996) (citing *Fredericks v. General Motors Corp.*, 411 Mich. 712, 720 (1981)).  "This definition of 'defective' is not limited to manufacturing defects, but also

---

[4] Defendant CDS does not differentiate any claim beyond arguing separately that Plaintiff Sarazin has failed to establish gross negligence.  However, because Defendant CDS did not move for partial summary judgment it can be assumed that Defendant CDS's argument regarding duty and proximate cause apply to Plaintiff Sarazin's asserted claims for negligence, implied and expressed warranty, products liability, and knowledge of defective product.

includes design defect." *Ghrist*, 451 Mich. at 249.

The Sixth Circuit has succinctly explained Michigan law on products liability on a theory of a design defect:

> [t]o prove a design defect under Michigan law, a plaintiff must show that the product was "not reasonably safe for its foreseeable uses" and that a "risk-utility analysis" favored a safer design. Under this approach, a plaintiff must show that (1) the product was not reasonably safe when it left the control of the manufacturer; and (2) a "feasible alternative production practice was available that would have prevented the harm without significantly impairing the usefulness or desirability of the product to users."

*Croskey v. BMW of North Am., Inc*., 532 F.3d 511, 515-16 (6th Cir. 2008) (citing Mich. Comp. Laws § 600.2946(2); *Gregory v. Cincinnati Inc*., 450 Mich 1, (1995)). The second prong of the analysis requires a "risk utility balancing test" that "invites the trier of fact to consider the alternatives and risks faced by the manufacturer in designing the product and to determine whether that in light of certain factors 'the manufacturer exercised reasonable care in making the design choices it made.'" *Croskey*, 532 F.3d at 516 (quoting *Prentis*, 421 Mich. at 688). A plaintiff meets this test by showing:

(1)     the severity of the injury was foreseeable by the manufacturer;

(2)     that the likelihood of the occurrence of the injury was foreseeable by the manufacturer at the time of distribution of the product;

(3)     that there was a reasonable alternative design available;

(4)     that the alternative available design was practicable;

(5)     that the available and practicable reasonable alternative design would have reduced the foreseeable risk of harm posed by the defendant's product; and

(6)     that the omission of the available and practicable reasonable alternative design rendered the defendant's product not reasonably safe.

*Croskey*, 532 F.3d at 516 (citing *Hollister v. Dayton Hudson Corp*., 201 F.3d 731, 738 (6th Cir.

13

2000); *Reeves v. Cincinnati, Inc*., 176 Mich. App. 181, 187-88) (1989)).[5]

Defendant CDS does not marshal any arguments regarding whether Plaintiff Sarazin has established a *prima facie* case of products liability in its motion for summary judgment, however, Defendant CDS does appear to briefly assert in its reply brief that Plaintiff Sarazin's *prima facie* case fails because the bushings on the SFK Cutter rendered the machine "safe" when delivered to Fagerdala.  Therefore, Defendant CDS appears to reason that Plaintiff Sarazin cannot establish the product was "not reasonably safe when it left the control" of Defendant CDS.  (Reply, at 2).  The Court notes that statutory language requires that a plaintiff establish that a product was "not reasonably safe when it left the control" of a manufacturer.  Here, it would appear that when the SFK Cutter left the control of Defendant CDS it was "reasonably safe" because it had bushings over the input and outputs of the machine such that the machine's blade could not cut.  However, this argument is weak where the Michigan Supreme Court, as well as the Sixth Circuit, has held that a product is "defective" if "it is not reasonably safe for its foreseeable uses."  *Ghrist*, 451 Mich. at 249 (citation omitted); *Croskey*, 532 F.3d at 515 ("To

---

[5] Michigan Courts have also explained that:

> [a] prima facie case of a design defect premised upon the omission of a safety device requires first a showing of the magnitude of *foreseeable risks*, including the likelihood of occurrence of the type of accident precipitating the need for the safety device and the severity of injuries sustainable from such an accident.  It secondly requires a showing of alternative safety devices and whether those devices would have been effective as a reasonable means of minimizing the foreseeable risk of danger.  This latter showing may entail an evaluation of the alternative design in terms of its additional utility as a safety measure and its trade-offs against the costs and effective use of the product.

*Cacevic v. Simplimatic Engineering Co.*, 248 Mich. App. 670, 292-93 (2001) (citation omitted) (emphasis in original).

14

prove a design defect under Michigan law, a plaintiff must show that the product was "not reasonably safe for its foreseeable uses" and that a "risk-utility analysis" favored a safer design."); *see also Shipman v. Fontaine Truck Equip. Co.*, 184 Mich. App. 706, 713 (1990) (finding that "where there is evidence presented of the manufacturer's knowledge of unsafe use, or that unsafe use is foreseeable, liability is not precluded."). In the instant case, the SFK Cutter was inoperable until the bushings were removed or bored through. Indeed, there is testimony from Lamorte and Pecora to this effect. (Pecora Dep. at 63-64, 93-94; Lamorte Dep. at 30, 38). Therefore, to the extent that Defendant CDS's argument could be construed to attack Plaintiff's *prima facie* case, such an argument fails.

## B.     Defendant CDS owed no duty to Plaintiff Argument

Defendant CDS broadly argues that all of Plaintiff Sarazin's claims fail because, while it owed a duty of care to Plaintiff Sarazin, its duty only extended to risks that were reasonable and foreseeable from the manufacturer's point of view. To this end, Defendant CDS relies upon *Fredericks v. General Motors*, 411 Mich. 712 (1981) and *Villar v. E.W. Bliss Co.*, 134 Mich. App. 116 (1984).

In *Fredericks*, the plaintiff lost most of his hand while operating an unguarded power press. The plaintiff pursued a claim of negligent entrustment against the defendant, who had not manufactured the dies themselves but had acquired them from the manufacturer and then contracted (or loaned) those dies to the plaintiff's employer. *Id*. at 717-18. The Michigan Supreme Court held that the plaintiff could not prove negligent entrustment because he could not evidence that the defendant "in fact knew" that the plaintiff's employer would use its dies in an unsafe manner. *Id*. at 719-20. The plaintiff also asserted in the alternative that an unguarded die "is unreasonably dangerous and should, therefore, be considered 'defective', giving rise to

15

products liability on the part of the supplier for personal injuries sustained by its use." *Id.* at 720. Specifically, the plaintiff claimed that his injuries were the result of the absence of a guard on that particular die and defendant could have supplied the needed guarding. *Id.*

The Michigan Supreme Court rejected the plaintiff's alternative argument noting first that the plaintiff's injury could have been prevented by other methods of guarding. The Michigan Supreme Court then reasoned:

> [a] product is defective if it is not reasonably safe for its foreseeable uses. An unguarded die may be used in a reasonably safe manner in a guarded press or in an unsafe manner in an unguarded press. At the time of plaintiff's injury 1967 PA 282 required that "[E]ach employer shall establish and maintain conditions of work which are reasonably safe and healthful for employees." In light of this statutory duty imposed on [plaintiff's employer] we cannot hold as a matter of law that it was foreseeable to defendant that the product it supplied would be used in an unsafe manner rendering it defective.

*Id.* at 720-21.

In *Villar*, a per curiam decision by the Michigan Court of Appeals, the plaintiff was injured while operating a press manufactured by the defendant. 134 Mich. App. at 118. The plaintiff brought suit against the defendant alleging negligent design and breach of implied warranty. *Id.* After a jury awarded the plaintiff damages, the defendant appealed the trial court's order denying its motion for a directed verdict. *Id.* In reversing the lower court the Michigan Court of Appeals relied upon the reasoning in *Fredericks*, noting that:

> [h]ere, as in *Fredericks*, a statute in existence at the time of plaintiff's injury placed a duty on the employer to maintain a reasonably safe workplace. The press manufactured by defendant here, like the dies at issue in *Fredericks*, was only a part of a press system. The press at issue here could only be used in conjunction with dies, a power source, and some method of feeding materials into the press.... The press was harmless and inoperable unless incorporated into such a system.

*Id.* at 120. The *Villar* court noted that there was unrebutted testimony that the press at issue

16

could have been operated safely in conjunction with a certain type of feeding mechanism. *Id.* at
120-21. As a result, the Michigan Court of Appeals reversed the trial court "[b]ecause
*Fredericks* shows that it was not foreseeable that plaintiff's employer would fail to incorporate
the press into a press system containing adequate safety devices". *Id.* at 121. The *Villar* court
also noted that while the plaintiff was not proceeding under a theory of negligent entrustment,
the plaintiff had failed to evidence the essential element in proving such a claim, namely that the
plaintiff had failed to evidence that the manufacturer had knowledge regarding the employer's
use of the machine and therefore it was "not *foreseeable* without *some* evidence that defendant
knew or should have known of the purchaser's unsafe use."[6] *Id.* (citation omitted) (emphasis in
original).

Plaintiff Sarazin claims that *Villar* is no longer good law in light of the more recent
Michigan Supreme Court decision in *Ghrist v. Chyrsler Corp.*, 451 Mich. 242 (1996), and as a
result Defendant CDS's reliance on *Villar*, which in turn relies on *Fredericks* is misplaced. In
*Ghrist*, a plaintiff was injured while working when his hand became caught in a die after he
reached into the press area to remove a part and the "kicker" descended unexpectedly. *Id.* at
244. The plaintiff sued the defendant manufacturer alleging a claim of products liability based in
part on the theory of negligent design and manufacture of the die, claiming the die had dangerous
pinch points even when used properly and the die could have been designed with safer kickers
without any decrease in utility. *Id.* The trial court relied upon the reasoning of *Fredericks* to
find that absent any evidence that the manufacturer knew that the original purchaser would use

---

[6] The Court notes that this appears to be dicta as the Michigan Court of Appeals
explicitly notes that the plaintiff in *Villar* was *not* proceeding under a negligent entrustment
theory, therefore, establishing proof of an essential element of that claim should not be essential
to proving a negligent defect.

the die press unsafely, there was no duty to provide safety devices not ordered by the purchaser.

*Id*.  The Michigan Court of Appeals affirmed this reasoning and cited specifically to *Fredericks* and *White v. Chrysler Corp*., 421 Mich 192 (1984).[7]  *Id*.

The Michigan Supreme Court first distinguished the facts of *Ghrist* from *Fredericks* and *White,* noting that the plaintiff in *Ghrist* filed the action against the actual designer and manufacturer of the die at issue (rather than merely the owner or previous owner).  The Michigan Supreme Court then explained:

> [t]he manufacturer is especially knowledgeable about a product's capabilities and limitations and the foreseeability of harm.  Further, the manufacturer is in the best position to effectuate needed safety-related improvements.  Because the manufacturer possesses both this knowledge and power, it is uniquely susceptible to the incentive structure built into the negligence standard and, as a result, is more likely to actually implement needed changes.  Moreover by putting the product into the stream of commerce, the manufacturer impliedly promises that the product is safe for its intended and all reasonably foreseeable uses.

*Id*. at 247-48 (citation omitted).  The *Ghrist* court also explicitly held that the mere fact that the die, on its own, was "an inert object only capable of causing injury when teamed with a working press" was not enough to "insulate" a manufacturer from liability under all circumstances, especially where there is evidence of a manufacturer's knowledge of an unsafe use or where such an unsafe use is foreseeable.  *Id*. at 248 n.10 (citing *Shipman v. Fontaine Truck Equip. Co.*, 184 Mich. App. 706, 713 (1990)).

The Michigan Supreme Court framed the issue in *Ghrist* as turning on the question of

---

[7] In *White*, the Michigan Supreme Court declined to extend the reaches of negligent entrustment where the defendant car manufacturer retained title to the unguarded die but not possession of the machine which was used by an outsourced component parts manufacturer in its power press.  The Michigan Supreme Court held that the defendant car manufacturer could not be subject to liability for the outsourced parts manufacturer's failure to observe workplace safety standards.

whether the die was defective and "not reasonably safe for its foreseeable uses." *Id*. at 249

(quoting *Fredericks*, 411 Mich. at 720).  The plaintiff argued that the die was defective and his

injuries were foreseeable because of the nature of the claimed defect and the ordinary use of the

product.  The defendant, however, argued (relying implicitly upon *Fredericks*) that it was not

"legally possible to foresee that the die would be used by Ghrist's employer in an unsafe

manner" because the employer was required by MIOSHA to provide a safe place of

employment.  The Michigan Supreme Court rejected the defendant's argument, stating:

> [a]lthough an employer has a statutorily imposed duty to make the workplace safe
> for its employees, MIOSHA does not abrogate the general duty of a manufacturer
> to exercise the degree of care necessary in the design and manufacture of a
> product to avoid all reasonably foreseeable injuries.  "The public interest in
> assuring that safety devices are installed demands more from the manufacturer
> than to permit him to leave such a critical phase of his manufacturing process to
> the haphazard conduct of the ultimate purchaser."
>
> Were this Court to hold otherwise, manufacturers would be free to rely upon
> MIOSHA as a shield and to manufacture products girded with only the bare
> minimum of safety features.  Responsibility would shift from the party most able
> to provide it in the least expensive and highest quality form and would rest solely
> on the shoulders of the comparatively ignorant party, the employer.

*Id*. at 250 (internal citation omitted).

In light of these cases, Defendant CDS argues that it owed no duty to Plaintiff Sarazin

when Fagerdala had a statutory and common law duty to safeguard the SFK Cutter.  To that end,

Defendant CDS contends that similar to *Villar* and *Fredericks*, the SFK Cutter was "harmless" in

the condition received and could not cause any injury until it was integrated into a

manufacturer's system.  Therefore, Defendant CDS argues that because the SFK Cutter "was

harmless until put into use by Fagerdala" and because Fagerdala had a duty to safeguard its

equipment under MIOSHA (and by reference the ANSI standards) it was not foreseeable to

Defendant CDS that it would be used in an unsafe manner with only a 12 inch tunnel guard and

19

not safeguarded by location.  (Def.'s Br. at 21).

Plaintiff Sarazin maintains that the Michigan Supreme Court's decision in *Ghrist* is on point where Defendant CDS is relying upon Fagerdala's statutory duties (as set forth in MIOSHA) to "shield" itself from any liability.  Plaintiff Sarazin also notes that Michigan has adopted a "fair share" system of liability for damages through its comparative fault statutes such that the trier of fact evaluates the percentage of fault of all persons (even non-parties) before allocating liability in proportion to the person's percentage of fault.  *See* Mich. Comp. Laws §§ 600.2956, 600.6304.  Therefore, Plaintiff Sarazin maintains that where Defendant CDS cannot shift or abrogate its duty to Plaintiff Sarazin through Fagerdala's statutory duty, summary judgment is not appropriate.

As an initial matter, Court recognizes that while Defendant CDS would like to equate the SFK Cutter to the die at issue in *Villar* or *Fredericks*, the SFK Cutter, unlike a die, is a stand alone machine that does not have to be incorporated into a manufacturing line to operate. Further, there is no question that the intended and foreseeable use of the SFK Cutter is to cut. Moreover, the *Ghrist* court specifically stated that even where a machine was "inert" and inoperable that fact could not insulate the manufacturer from liability in all circumstances. Finally, unlike *Fredericks* and *Villar,* in the instant case there is evidence that could give rise to a reasonable inference that Defendant CDS was actually aware of Fagerdala's specific use of the SFK Cutter, as examined more below.

In determining whether Defendant CDS owes a duty to Plaintiff Sarazin, the Court is mindful of "certain principles" including the fact that "whether a duty exists is a question of law, an issue solely for the court to decide".  *Torono v. 2SI, LLC*, No. 03-74091, 2006 WL 1284924 (E.D. Mich. May 10, 2006) (quoting *Murdock v. Higgins*, 454 Mich. 46, 53 (1997)).

20

Additionally, under Michigan law, a "manufacturer has a duty to design its product so as to eliminate any unreasonable risk of foreseeable injury." *Prentis*, 421 Mich. at 693.  Critically however, the Michigan Supreme Court has held that whether a design is defective and whether there was an unreasonable risk of foreseeable injury to a plaintiff are questions of fact. *Ghrist*, 451 Mich. at 249 n. 13 (1996); *Gregory v. Cinncinnati Incorporated*, 450 Mich 1, 13 (1995).

In the instant case there are genuine issues of material fact regarding whether Fagerdala's unsafe or poorly guarded use of the SFK Cutter and Plaintiff Sarazin's resulting injury were foreseeable.  Defendant CDS argues that there is testimony, including from Plaintiff Sarazin's own expert, that the SFK Cutter could have been adequately safeguarded by location or by the optional 36 inch tunnel guards.  However, there is also testimony that Defendant CDS's representative, Pecora, traveled to Plaintiff Sarazin's plant at least once and evidence of extensive negotiations regarding the SFK Cutter and puller between Fagerdala and Defendant CDS that took place for more than a year.  Further, there is testimony from Lamorte and Pecora that Defendant CDS was well aware that the SFK Cutter's bushing had to be bored out for the machine to be operable as a cutter.  Viewing these facts in the light most favorable to Plaintiff Sarazin, a jury could conclude that Defendant CDS gained actual knowledge of the use of the SFK Cutter through Pecora's personal visit and its negotiations for the purchase of the SFK Cutter and the puller and, therefore, had actual knowledge that the SFK Cutter would not be safeguarded by location and that Fagerdala would be producing pool noodles that necessitated the bushing be bored out to six inches.  (*See* Pecora Dep. at 65-66, stating that he was aware that Fagerdala produced pool noodles and the largest noodle the SFK Cutter could produce was six inches in diameter).

21

Additionally, Defendant CDS admitted that once the bushings were open the unguarded blades posed a risk for severe injury.  (Pecora Dep. at 93-94; Lamorte, 30, 38, 40).  Indeed, there is no dispute that Defendant CDS offered 36 inch interlocking tunnel guards for sale at the time Fagerdala purchased the SFK Cutter.  Accordingly, there is a reasonable inference that Defendant CDS was aware of the danger associated with an unguarded SKF Cutter.  *See Cacevic v. Simplimatic Eng. Co.*, 248 Mich. App. 670, 681 (2001) (holding that the plaintiff raised a genuine issue of material fact regarding whether a manufacturer was aware of the magnitude of a foreseeable risk associated with a palletizer where the manufacturer had placed an inadequate mesh guard on the machine.).  Given these unresolved issues of material fact, the Court cannot say "as a matter of law" that Defendant CDS could not reasonably foresee the risk that an employee would insert their hand or arm into the SFK Cutter.

In the same vein and relying upon the same case law, Defendant CDS also argues that it is entitled to summary judgment because Fagerdala modified the SFK Cutter after its receipt and under Michigan law "[a] manufacturer or seller is not liable in a product liability action for harm caused by an alteration of the product unless the alteration was reasonably foreseeable."[8]  MICH. COMP. LAWS § 600. 2947(1).  Defendant CDS contends that it was "not reasonably foreseeable that the Plaintiff's employer, Fagerdala, would put safeguards that were too short and use the machine in an unsafe manner."  (Def.'s Br. at 19).  Defendant CDS goes on to argue that because there is no dispute that the machine arrived with intact bushings and no tunnel guards, Fagerdala modified the SFK Cutter by boring the bushings open and adding 12 inch tunnel guard, and ergo,

---

[8] Section 2947(1) further provides that "[w]hether there was an alteration of a product and whether an alteration was reasonably foreseeable are legal issues to be resolved by the court." Mich. Comp. Laws § 600.2947(1).

there is no liability as to Defendant CDS.

Again, Defendant CDS's argument ignores the fact that the SFK Cutter cannot be used unless the bushings are removed or bored out. Therefore, there is no question that while the SFK Cutter arrived with intact bushings a jury could find that it was "reasonably foreseeable" that the bushings would be bored or removed because without doing so the machine would remain inoperable. Therefore, it is "reasonably foreseeable" that Fagerdala would modify the SFK Cutter in this fashion to utilize the machine for its intended purpose - to cut product. To the extent that Defendant CDS argues that Fagerdala's modification of the product to include the woefully short 12 inch tunnel guard was not foreseeable, the same issues of material fact cited above are at issue. Specifically, where it was foreseeable that the bushings had to be opened for use, it could logically follow that it was foreseeable that a user would attempt to (ineffectively) safeguard the input opening when no safeguarding was provided.

Given these facts, especially the questions regarding the actual knowledge of Defendant CDS regarding the use of the SFK Cutter by Fagerdala, the Court cannot find as a matter of law that Defendant CDS did not owe a duty to Plaintiff Sarazin. Additionally, the Court finds that summary judgment is inappropriate based on § 600.2947 where similar questions remain regarding whether it was reasonably foreseeable that Fagerdala would alter the SFK Cutter after its purchase.

**C.     Proximate Cause Argument**

Defendant CDS next argues that even if it owed a duty to Plaintiff Sarazin as the manufacturer of the SFK Cutter, its failure to include 36 inch tunnel guards was not the proximate cause of her injury and therefore, summary judgment should be granted.

In Michigan, "[a]s part of a prima facie case in a products liability action, a plaintiff must

23

show that the defendant's conduct was the proximate cause of the plaintiff's injuries." *Walton v. Miller*, No. 293526, 2011 WL 4580589, at * 2 (Mich. Ct. App. 2001) (citing *Skinner v. Square D Co.*, 445 Mich. 153, 162 (1994)). The Michigan Supreme Court has held that proving proximate cause "entails proof of two separate elements: (1) cause in fact, and (2) legal cause, as known as 'proximate cause.'" *Skinner*, 445 Mich. at 162-63 (citation omitted). "The cause in fact element generally requires showing that 'but for' the defendant's actions, the plaintiff's injury would not have occurred. On the other hand, legal cause or 'proximate cause' normally involves examining the foreseeability of consequences, and whether a defendant should be held legally responsible for such consequences." *Id.* at 163. (internal citation omitted).

Interestingly, Defendant CDS argues that Plaintiff Sarazin cannot establish that "but for" Defendant CDS's failure to attach 36 inch interlocking guards on the SFK Cutter, her injury would not have occurred. However, Defendant CDS states explicitly in its brief that "it is undisputed that Plaintiff's injury would not have occurred if the safe guard was longer than 12 inches, specifically if the opening for the safety guard was at least 3[6] inches from the blade inside the Servo-Fly Knife cutting machine." (Def.'s Br. at 23; *see also* Eby Dep. at 206). Therefore, in making its argument that Fagerdala should have attached longer tunnel guards, Defendant CDS has conceded the "but for" causation inquiry for proximate cause (namely, that but for the lack of the proper guard, no injury would have resulted).[9]

---

[9] Defendant CDS argues that had Plaintiff Sarazin been properly trained not to put her hand in the machine or in the lock out/tag out procedures during a shut down of the line, her injury would not have occurred. Again, by admitting that a 36 (or 32) inch tunnel guard would have prevented her injury, Defendant CDS undermines if not invalidates its argument on this issue.

"A proximate cause is a foreseeable, natural, and probable cause of the plaintiff's injury and damages." *Kaiser v. Allen*, 480 Mich. 31, 37-38 (internal quotation marks removed and citation omitted). "When a number of factors contribute to produce an injury, one actor's negligence will not be considered a proximate cause of the harm unless it was a substantial factor in producing the injury." *Brisboy v. Fibreboard Corp.*, 429 Mich. 540, 548 (1988) (citation omitted). Defendant CDS argues that the failure to include 36 inch interlocking tunnel guards on the SFK Cutter cannot be found to be a "substantial" cause for Plaintiff Sarazin's injury because she was admittedly not trained properly by Fagerdala, the machine was not guarded by location, and Moenaert testified that the tunnel guard Fagerdala installed was shortened to 12 inches. Defendant CDS argues that because Fagerdala shortened its tunnel guard to 12 inches, the Court must find that Fagerdala would have modified any tunnel guard Defendant CDS installed on the machine to 12 inches and therefore no proximate cause can be attributed to the failure of the SFK Cutter to include such guarding.

First, whether the tunnel guard installed by Fagerdala was shortened to 12 inches from some other longer length is a question of fact in dispute. Therefore, taking the facts in the light most favorable to Plaintiff Sarazin, the Court must assume the tunnel guard was not shortened to 12 inches. Further, Moenaert testified that he was unaware of the MIOSHA standards or any standards that would have dictated the proper length of a tunnel guard for the SFK Cutter. Additionally, Moenaert testified that a 36 inch guard did not affect the functionality of the machine or the ability of the employees to use the machine and testimony that Fagerdala's production line had adequate room to accommodate the 36 inch guard. (Moenaert Dep. at 29-31; Cronenworth Dep. at 64-65, 80). Given these facts, it would be reasonable to conclude that Fagerdala may not have shortened a 36 inch tunnel guard supplied by Defendant CDS.

25

Further, Defendant CDS argues that its failure to supply at least a 36 inch tunnel guard cannot be found to be a substantial factor in Plaintiff Sarazin's injury because such a guard would not have remedied Plaintiff Sarazin's lack of training and "extra long guards installed by CDS would not have changed the location of the machine such that access to the cutting chamber was not possible." (Def.'s Br. at 25). In support of its argument, Defendant CDS relies upon *Miller v. Bliss*, No. 209017, 2000 WL 33521872, at *4 (Mich. App. 2000), where the court found that when an employer "disabled significant safety devices on the press, allowed plaintiff to operate the press without appropriate training, and instructed plaintiff to manually remove any jammed material with his hands" those acts constituted an "intervening act severing any liability" on behalf the manufacturer.

The Court finds *Miller* distinguishable on its facts. In the instant action, Plaintiff Sarazin was never instructed to remove anything from the machine with her hands (in fact, it is unrebutted that Plaintiff Sarazin was told *not* to put her hand in the machine), Fagerdala did not remove or disable any safety devices (but rather attempted to construct them), and Plaintiff Sarazin was never allowed or instructed to operate the SFK Cutter. Further, Defendant CDS's argument obfuscates the point that Plaintiff Sarazin would not have been able to insert her hand in the machine if there was a 36 inch guard, regardless of her training. Similarly, the 36 inch long guard would have negated any need for Fagerdala to safeguard by location. Therefore, to the extent Defendant CDS argues that the lack of proper guarding cannot be found to be substantial factor in causing Plaintiff Sarazin's injury or that Plaintiff Sarazin's lack of training or the failure to safeguard by location represent an intervening act that could severe any liability, this argument fails.

26

Accordingly, the Court finds that summary judgment is not appropriate on the issue of "proximate cause."

**D.    Gross Negligence/Knowledge of Defective Condition**

Defendant CDS next argues that Plaintiff Sarazin's claims for gross negligence and knowledge of defective condition should be dismissed because she cannot support her claims with any evidence that Defendant CDS acted recklessly or whether Defendant CDS knew the SFK Cutter was "defective".

Defendant CDS argues that Plaintiff Sarazin cannot show that Defendant CDS had knowledge of a defective condition because Fagerdala accepted the SFK Cutter at delivery and put the machine to use, evidencing the fact that the machine had no defect and was operable. However, a defective product is not defined as a product that is unusable but rather a defective product is one that is "not reasonably safe for its foreseeable uses." *See Ghrist*, 451 Mich. at 249 (citation omitted).  Therefore, as discussed above, there remain genuine issues of material fact regarding whether the product was "defective" when there is testimony in the record from Defendant CDS that the foreseeable use of the SFK Cutter was to open the bushings and cut things.  (Pecora Dep. at 93-94).  Further, there remains a genuine issue of material fact regarding whether Defendant CDS had particular knowledge of exactly how the SFK Cutter would be utilized by Fagerdala.  Therefore, summary judgment is not appropriate where such questions remain.

Gross negligence is defined as "conduct so reckless as to demonstrate a substantial lack of concern for whether injury results."  MICH. COMP. LAWS § 600.2945(d).  Defendant CDS argues that its conduct was not reckless because the machine was harmless when it left its control and because it "verbally offered" the 36 inch guard to Fagerdala who chose to refuse the

safety feature.[10]  As examined *supra*, there are genuine issues of material fact regarding whether Defendant CDS had actual knowledge regarding the set up and use of the SFK Cutter in Fagerdala's plant.  Further, there is testimony that Defendant CDS was aware that the SFK Cutter was unsafe without guarding when the bushings were removed.  (Lamorte Dep. at 33; Pecora Dep. at 71-72).  Additionally, despite Defendant CDS's arguments to the contrary, there is no documentary evidence that supports the contention that Fagerdala was ever specifically offered (and then rejected) the 36 inch tunnel guard as an option from Defendant CDS.  Pecora merely testified that it was his usual practice to offer the guards to customers.  Indeed, while Pecora testified that the 36 inch optional tunnel guards made the machine safer (Pecora Dep. at 93), he also testified that while a customer would see some value in interlocks and enclosure guards "I would not, I would only see dollars."  (*Id.* at 92).  Taking all these facts in a light most favorable to Plaintiff Sarazin, a reasonable jury could conclude that Defendant CDS's failure to provide 36 inch interlock tunnel guards as a standard safety device on the SFK Cutter despite the technology being available amounted to "gross negligence".

**E.     Plaintiff Sedgwick Insurance's Complaint**

Defendant CDS has also moved this Court to dismiss Plaintiff Sedgwick Insurance's complaint pursuant to FED. R. CIV. P. 12(b)(6).  Plaintiff Sedgwick is the Worker Compensation insurance carrier for Fagerdala and its action against Defendant CDS, as a third party, was consolidated with Plaintiff Sarazin's complaint.  Plaintiff Sedgwick seeks reimbursement from

---

[10] To the extent Defendant CDS relies upon hearsay testimony from a Fagerdala employee regarding comments made about a cutter when the plant first opened in 2004, indicating that "if somebody stuck their arm in there they deserved to have it cut off", such a comment is not relevant to the instant SFK Cutter that was purchased two years later in 2006. (*See* Def.'s Br. at 27; Zimmer Dep. at 25-26; Cronenworth Dep. at 47).

Defendant CDS for benefits paid to Plaintiff Sarazin and it sets forth claims identical to those asserted by Plaintiff Sarazin. Pursuant to MICH. COMP. LAWS § 418.827, Plaintiff Sedgwick can recover only to the extent that Defendant CDS is found liable to Plaintiff Sarazin.[11]

Defendant CDS argues that because the claims are identical, if the Court grants summary judgment to Defendant CDS and finds it has no liability as to Plaintiff Sarazin, then Plaintiff Sedgwick's claims must be dismissed for failure to state a claim under Rule 12(b)(6).

Plaintiff Sedgwick failed to respond to Defendant CDS's motion for summary judgment. For this reason Defendant CDS also asks the Court to dismiss its complaint because of its failure to respond.

As the Court finds genuine issues of material fact exist as to Plaintiff Sarazin's claims, it will deny Defendant CDS's request to dismiss Plaintiff Sedgwick's claims premised only on the assumption that Defendant CDS has bears no liability to Plaintiff Sarazin. The Court also declines to dismiss Plaintiff Sedgwick's complaint solely for the reason it did not respond to Defendant CDS's motion.

---

[11] "Any recovery against the third party for damages resulting from personal injuries or death only, after deducting expenses of recovery, shall first reimburse the employer or carrier for any amount paid or payable under this [Worker's Compensation Act] to date of recovery and the balance shall immediately be paid to the employee ... and shall be treated as an advance payment by the employer on account of any future payments of compensation benefits." MICH. COMP. LAWS § 418.827(5).

**IV. CONCLUSION**

For all these reasons, the Court DENIES Defendant F.A.B.E. Custom Downstream

Systems, Inc.'s Motion for Summary Judgment (ECF No. 45).

IT IS SO ORDERED.


s/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated: January 22, 2015

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or
party of record herein by electronic means or first class U.S. mail on January 22, 2015.


s/Deborah Tofil
Case Manager